United States District Court
Southern District of Texas
**ENTERED**
September 29, 2020
David J. Bradley, Clerk

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § § | CRIMINAL ACTION NO. 4:19-CR-00817 |
| vs. | § § § | JUDGE CHARLES ESKRIDGE |
| ERIC WAYNE CURTIS | § § | |

### MEMORANDUM AND OPINION
### GRANTING MOTION TO SUPPRESS

The United States government has charged Defendant Eric Wayne Curtis with the unlawful possession of a firearm and ammunition by a convicted felon in violation of 18 USC §§ 922(g)(1) and 924(a)(2). Dkt 12. Officers of the Houston Police Department seized these items during a search of Curtis's person after a warrantless entry into his home. Curtis moves to suppress this evidence as the fruit of an unconstitutional search. Dkt 18.

Warrantless entry and searches within a person's home are presumptively unreasonable under the Fourth Amendment. The government argues that exceptions applied regarding consent and the rendering of emergency aid. It also asserts that a limited pat-down search of Curtis was permitted once the officers were inside his home. But the government establishes neither the requisite emergency nor actual consent under the totality of the circumstances. With nothing constitutionally justifying their presence in Curtis's home, the evidence seized from him during the pat-down search cannot be used in his prosecution.

The motion to suppress is granted.

1.   Findings of fact

The Court held an extensive evidentiary hearing on this motion by videoconference due to circumstances presented by the COVID-19 pandemic. The government presented testimony from Officers Aaron Crum and Sarah Wakefield. Both were present in Curtis's home at the time of the pat-down search, which Officer Crum conducted. They are two members of a Houston Police Department "hot spot" team. These teams exist to proactively combat crime in the city's high-crime areas. Tr 18.

The government placed into evidence these officers' bodycam videos of the events on the street and inside Curtis's home on the evening of his arrest, along with another bodycam video from Officer Pierce D'Avila. Dkt 27. The government also put into evidence a relevant screenshot taken from Officer Wakefield's bodycam video of wounds that Curtis had sustained earlier that evening. Id.

Curtis offered into evidence the incident report that Officer Crum prepared the next morning. Dkt 26. He did so to impeach testimony as inconsistent with that more-contemporaneous account of the evening. He also offered his Harris County criminal history background. Dkt 26-1. Curtis did this to emphasize a lack of violence or firearm-related convictions. Tr 80–81. That is generally so, but his record is extensive. It shows twenty-five offenses in Harris County dating back to 2001. Dkt 26-1. Most relate to drug possession. Six others were for resisting or evading arrest. And one dismissed charge was for murder.

The Court has reviewed the three bodycam videos in their entirety. They range up to 120 minutes in length. Substantial excerpts were played during the testimony of both Officers Crum and Wakefield, upon which they were closely questioned. The details of the conversations, the gestures and conduct of the persons involved, and the scene depicted on the videos is central to the analysis. But the transcript reflects only notation of "Video Played" during referenced excerpts, without transcription of anything said or seen as they played. For example, see Tr 22. The narrative that follows of those quotes and that visual record is thus the Court's own. It is primarily drawn from the bodycam

video of Officer Crum. But each video reflects the events at issue from slightly different perspectives, with some aspects on only one video and not the others. Each video was synced to the same date and time, and timestamp indications are to the displayed time on the videos.

The Court makes the following factual findings based on the videos, the testimony, and the exhibits presented.

*21:14:30:* Officers Crum and Wakefield were together in a patrol car in north Houston on the evening of September 21, 2019. Tr 19. A report came over the police radio about a recent shooting. It identified Curtis as a potential shooting victim. Briefing establishes that the shooting occurred approximately two hours earlier at 7:19 p.m. Dkt 19 at 1.

Both officers testified that they knew Curtis and recognized the address as his home. Tr 19, 98. They were specifically familiar with his criminal background. Tr 25; see Dkt 26-1 (criminal record). Officer Crum testified that Curtis is a documented gang member. Tr 24.

*21:15:32:* Officers Crum and Wakefield arrived at Curtis's home to assist the responding officers. Tr 19. Other officers were already present, along with a fire truck and several Houston Fire Department (HFD) and emergency medical technician (EMT) personnel.

*21:16:03:* Officers Crum and Wakefield began talking with Delvin Grundy about thirty seconds after arriving. Grundy is Curtis's cousin. He told them that he'd been informed that Curtis came home after having been shot but then rode off on a bicycle. Grundy said that he placed the call to the police and asked for an ambulance. He also said that he hadn't personally seen Curtis but instead arrived at the home after Curtis left on the bicycle.

*21:17:10:* The name of Curtis's sister wasn't made part of the record. But it was at this point that she joined the conversation. A young teenage boy also came out of Curtis's house. Curtis's sister identified him as her son and told him to go back inside and put on a shirt.

*21:17:40:* Officer D'Avila arrived on the scene shortly after. Officer Wakefield told him that Curtis had been shot at a location

about five miles away from his house. Officer Wakefield testified that she thought Curtis had likely been shot in a retaliatory shooting. Tr 97.

*21:18:25:* Officer D'Avila then joined the conversation with Grundy. Grundy told the officers that Curtis wouldn't want to go in an ambulance, so he had to "trick" him into going. He also mentioned that Curtis does "wet" at times, but he didn't know whether he was using that night. Testimony established that "wet" is a street term meaning phencyclidine, also known as PCP. Tr 31. Another family friend also approached the conversation during this time.

*21:21:05:* It was at this point that Curtis returned home riding his bicycle. This was about five minutes after Officers Crum and Wakefield had arrived on scene. Officer Crum used Curtis's nickname and said, "E-Bay, get over here!" Officers Crum, Wakefield, and D'Avila then approached Curtis as he was riding up to his house. Several other officers, HFD and EMT personnel, and Grundy also walked over to him.

*21:20:20:* Curtis stopped riding as he reached them. He stood while still astride the bicycle. Officer Crum testified that Curtis seemed delirious. Tr 27. Officers Crum and Wakefield both asked Curtis where he had been shot. Curtis confirmed he was shot in the face and arm. Officer Wakefield shined her flashlight, and injuries were apparent to his right upper arm and right cheek. Both were covered with small bandages. Officer Crum testified that he couldn't get a good look at the injuries because of these dressings. Tr 27. Blood had leaked through the arm bandages, but the wound wasn't actively bleeding. Curtis said the bullet had passed through. The wound on his cheek appeared to be a graze only, and little if any blood was leaking from the bandage. See also Dkt 27 (screenshot).

*21:21:34:* About a minute after Curtis rode up on the bicycle, Officer D'Avila asked him, "Why don't you get off the bike and just sit down for me real quick, OK? We're going to have HFD come check you out, OK?" Curtis replied, "Alright." Officer D'Avila put his hand on Curtis's left arm to assist him off. Grundy grabbed the other arm and Curtis's bicycle.

4

*21:21:42:* An ambulance then arrived and parked behind the fire truck. Officer D'Avila asked him, "You wanna take a seat?" Curtis didn't answer. He instead started walking towards his home and away from the ambulance. Grundy then caught up to him from behind, grabbing his right arm and telling him several times to sit down. Officer D'Avila also then grabbed Curtis's left arm. This stopped Curtis from proceeding on to his home.

*21:22:20:* An EMT or someone from HFD then approached and told Curtis that they just wanted to check him out. Officer D'Avila told Curtis that he wasn't in trouble. Curtis said, "Alright." Officer D'Avila asked, "You'll sit in the ambulance with us, right?" Curtis didn't respond. Officer D'Avila then asked, "You want your people to come take you?" Curtis replied, "Yeah."

*21:22:35:* Officer D'Avila released Curtis's arm. Still holding him, Grundy twice asked, "Want me to take you? I'll take you." Two individuals that were either EMTs or HFD personnel then said, "He needs to go in the ambulance."

*21:22:45:* Grundy said to Curtis, "They say you gotta go in the ambulance." Curtis spoke closely to Grundy for a few seconds, which was inaudible on the bodycam videos. Curtis then turned around and again started walking towards his home, holding the right pocket of his pants. He was wearing very large, loose-fitting sweat shorts. Grundy told the officers, "He said he gotta get something."

*21:22:50:* Officer D'Avila followed a few steps behind Curtis and asked, "Eric, what you gotta get, bro?" Curtis didn't respond but instead kept walking.

*21:23:00:* Officer D'Avila stepped in front of Curtis when he was about ten feet from the front door. He put his right hand on Curtis's chest, halting him and preventing him from continuing on into his home. Officer Wakefield from behind then grabbed Curtis's right arm. Grundy also held his torso. Officer D'Avila told Curtis, "You're delirious right now, my man. I just need you to sit down and breathe and let HFD come check you out before you do anything, OK?" Curtis responded, "OK," with an apparent tone of frustration in his voice.

*21:23:12:* Officer Crum had also followed Curtis. He positioned himself between Curtis and his home and asked, "Do you recognize me?" Curtis said, "Yeah." Officer Crum reiterated that Curtis wasn't in any trouble. Curtis responded again with frustration, "OK." Officer Crum then asked Curtis what he needed from inside the house. Curtis didn't respond.

*21:23:16:* Curtis's sister had also followed along with them. She said to Curtis, "I got your phone." Curtis didn't respond and instead began moving again towards his front door. Officer Wakefield continued to hold onto his arm as he moved toward his front door but eventually let go.

*21:23:20:* The front door was already open. Officer Crum was slightly ahead of Curtis and went through the door first, opening it a bit more as he did so. He was followed immediately after by Curtis. Then entered Officer D'Avila, Officer Wakefield, Grundy, Curtis's sister, and EMT and HFD personnel. Tr 90. At no point did any of the officers or other responding personnel ask Curtis, his sister, or his cousin if they could enter the house. Just before entering Officer D'Avila said to Grundy, "Here let us get in there real quick. No weapons in the house, right?" Grundy replied, "I don't know. I don't live here."

*21:23:25:* Curtis's front door opens directly into his living room. The room was dimly lit. Officer Crum told Curtis to take a seat once inside. Curtis instead attempted to walk past him towards a hallway leading off the back. Officer Wakefield also asked Curtis to sit down so the EMTs could come check on him. Officer Crum touched Curtis's right arm and again told him to sit down.

*21:23:35:* Curtis eventually sat down on a chair in his living room. Curtis's sister said, "It seems like he 'bout to fall out. He might be high." Officer Crum stood over Curtis and illuminated him with a flashlight. Curtis then put his hand into the left pocket of his shorts. Officer Crum immediately patted down Curtis's left pocket. Officer D'Avila asked Curtis, "Eric, you got any weapons on you or drugs or anything, man?" Curtis didn't respond.

*21:23:45:* Officer Crum testified that he then noticed a large lump or bulge in Curtis's right pocket. Tr 36. The bodycam video isn't of sufficient quality as to make this apparent. Officer Crum

6

patted down Curtis's right pocket. He testified that he felt a hard object like the butt of a pistol. Tr 36. Officer Crum asked, "Is this a burner?" Curtis said, "Yeah. Don't take it." Officer Crum reached into Curtis's right pocket and removed a 9-millimeter semi-automatic pistol and a full magazine with twelve rounds.

*21:23:55:* With urgency and at the insistence of Officer Crum, the other officers grabbed Curtis's hands and fully restrained him. They continued to search him. An EMT approached and said, "I need to check real quick his arm." But Officer D'Avila replied, "Hey guys, can you give us some room?" Other HFD and EMT personnel attempted to approach Curtis. Officer Crum said, "Hey, y'all step outside." Officer D'Avila then insisted, "Get outside. Get outside. Everybody get outside." One of the HFD or EMT personnel asked, "Us, too?" Officer Crum said, "Yes." All such personnel then exited the house.

*21:24:35:* Officer Wakefield placed Curtis's hands in cuffs in front of him. The officers continued to carefully pat him down but found nothing else. During this time, Curtis's sister had gone to the back room to get her children to exit the house.

*21:26:05:* Curtis received no medical treatment or attention of any kind inside his home. About two minutes after being handcuffed, Officers Crum and Wakefield stood Curtis up to walk him outside. Curtis's sister asked, "Why y'all got him in handcuffs?" Officer Crum replied, "Because he's a convicted felon. He's not allowed to have a gun."

*21:26:45:* The officers told Curtis that they intended to walk him to the ambulance. But they found that it had moved once they were outside. Curtis was instead walked past one police cruiser and placed into another while they waited for the ambulance. It took them about forty seconds to reach the first police cruiser and another ten seconds to the reach the second.

*21:27:40:* Officer D'Avila patted down Curtis again outside the police cruiser.

*21:28:20:* Someone from HFD briefly examined Curtis's arm wound. Officers Wakefield and D'Avila directed him to sit in the police cruiser. An EMT then came to check Curtis's arm wound.

*21:29:30:* The ambulance arrived about a minute later. The officers and various EMT and HFD personnel examined Curtis' wounds again outside the ambulance.

*21:31:20:* The officers directed Curtis into the ambulance. EMTs properly bandaged his arm and provided other medical attention for approximately six minutes.

*21:37:30:* The ambulance then departed. Officer D'Avila rode in the cabin while Curtis lay restrained on a gurney. Officer D'Avila's bodycam video recorded about eleven minutes of travel to the emergency room and the waiting time until Curtis's intake medical examination. What happened in those minutes isn't pertinent to the analysis below and so it isn't recounted in detail. The Court does note that approximately thirty minutes passed from Curtis's arrival at the emergency room until a doctor examined him.

All told, Officers Crum, Wakefield, D'Avila, and various HFD and EMT personnel were present at Curtis's home for just over sixteen minutes from when Curtis arrived on the bicycle until he was driven away in the ambulance. Curtis remained calm throughout that entire time, never acting violently or aggressively. He wasn't belligerent or provocative in any way. Likewise, the involved officers and personnel acted calmly and respectfully to Curtis and all citizens on the scene at his home. Their weapons were never drawn or brandished. The only raising of voices and escalation of tensions was directed by Officer Crum at his fellow officers in the brief moments after he found the gun on Curtis's person when he insisted they restrain Curtis more fully for a complete search.

### 2. Legal standard

The questions presented here fall squarely within the protections of the Fourth Amendment to the United States Constitution. It provides in full:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the

place to be searched, and the persons or things
to be seized.

US Const Amend IV.

Those who ratified the Fourth Amendment were quite familiar with the notion of security in their persons and property—and the dangers arising from governmental intrusions into their homes. It was a prominent concept in English law. Sir William Blackstone published the four volumes of his *Commentaries on the Laws of England* between 1765 and 1769, quite proximate to the American Revolution. In that work he observed:

> For every man's house is looked upon by the
> law to be his castle of defence and asylum,
> wherein he should suffer no violence. Which
> principle is carried so far in the civil law, that for
> the most part not so much as a common
> citation or summons, much less an arrest, can
> be executed upon a man within his own walls.

3 Sir William Blackstone, *Commentaries on the Laws of England* 288 (1768). Sir Edward Coke expressed a similar sentiment well more than one hundred years earlier in his *Institutes on the Laws of England*, stating, "For a man's house is his castle, *et domus sua cuique est tutissimum refugium* [and each man's home is his safest refuge]." 3 Sir Edward Coke, *Institutes of the Laws of England* 162 (1628).

Such passages have an obvious influence on understanding the Fourth Amendment as applied to the situation at hand. And the Supreme Court has of course examined the history and purposes of the Fourth Amendment on many occasions. See *Warden, Maryland Penitentiary v Hayden*, 387 US 294, 301 n 9 (1967) (listing cases). It notes that the Fourth Amendment "was a reaction to the evils of the use of the general warrant in England and the writs of assistance in the Colonies, and was intended to protect against invasions of 'the sanctity of a man's home and the privacies of life,' . . . from searches under indiscriminate, general authority." Ibid, citing *Boyd v United States*, 116 US 616, 630 (1886). It more pointedly observes, "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v United States District Court*

*for Eastern District of Michigan Southern Division*, 407 US 297, 313 (1972).

It is a basic tenet of Fourth Amendment law that a warrantless search is presumptively unreasonable. *United States v Jaras*, 86 F3d 383, 388 (5th Cir 1996); see also *United States v Aguirre*, 664 F3d 606, 610 (5th Cir 2011). To protect these interests and properly limit sovereign action on the use of searches and seizures, the Supreme Court adopted an "exclusionary rule" requiring the suppression of evidence obtained in violation of the Fourth Amendment. *United States v Calandra*, 414 US 338, 347 (1974); see originally *Bram v United States*, 168 US 532 (1897) (first articulating and applying exclusionary rule to involuntary confessions); *Weeks v United States*, 232 US 383 (1914) (first applying exclusionary rule in Fourth Amendment context). But this isn't a blanket rule. And indeed, the Fourth Amendment textually phrases its protections of the people as a prohibition only of "unreasonable searches and seizures." US Const Amend IV.

Certain exigencies "make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v Arizona,* 437 US 385, 393–94 (1978). A number of well-recognized exceptions to the warrant requirement thus exist and are frequently litigated. For example, see *Brigham City, Utah v Stuart*, 547 US 398, 403 (2006) (need to render emergency aid); *Preston v United States*, 376 US 364, 367 (1964) (imminent destruction of evidence); *Chapman v United States*, 365 US 610, 615 (1961) (hot pursuit of fleeing suspect); *Washington v Chrisman*, 455 US 1, 5 (1982) (objects in plain view). And of course, consent is another recognized and often-litigated exception. See *Davis v United States*, 328 US 582, 593–94 (1946).

These exceptions are narrow and well-delineated. The Supreme Court is adamant that they must be so to retain their constitutional character. *Katz v United States,* 389 US 347, 357 (1967). As such, the prosecution bears the burden of bringing the search within one of them. *Aguirre*, 664 F3d at 610.

3. Analysis

Curtis argues that the evidence of the firearm and ammunition should be suppressed because the officers seized

them pursuant to a warrantless search of his person inside his home. The government stipulates that this was a warrantless entry unsupported by probable cause. Tr 12. It instead relies on exceptions pertinent to the rendering of emergency aid and consent. It also asserts that the pat-down by Officer Crum falls within the procedures allowed by *Terry v Ohio,* 392 US 1 (1968).

a. Warrantless entry; exigent circumstances

The government asserts that warrantless entry by the officers into Curtis's home was justified by exigent circumstances— namely, the need to render emergency aid to him. Dkt 19 at 3. Curtis argues to the contrary that that he was in no immediate need of medical assistance. Dkt 18 at 3. He also argues that the exception is inapplicable because he refused medical treatment outside his home before retreating into it. Id at 4.

A recognized exception to the warrant requirement is "the existence of exigent circumstances justifying immediate action." *Linicomn v Hill,* 902 F3d 529, 536 (5th Cir 2018), citing *Rice v ReliaStar Life Insurance Co,* 770 F3d 1122, 1130–31 (5th Cir 2014). One such circumstance is "the need to assist persons who are seriously injured or threatened with such injury." *Stuart,* 547 US at 403. The Supreme Court thus holds that "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Ibid, citing *Mincey,* 437 US at 392.

This emergency-aid exception doesn't depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises. *Michigan v Fisher,* 558 US 45, 47 (2009), quoting *Stuart,* 547 US at 404–05. "It requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid." *Fisher,* 558 US at 47 (quotations marks and citations omitted). The Fifth Circuit phrases it as a test of objective reasonableness in view of all the circumstances: "Whether exigent circumstances exist to justify a warrantless search depends on whether, given the totality of the circumstances, the search was objectively reasonable." *Linicomn,* 902 F3d at 536, citing *Stuart,* 547 US at 404.

The government points to several facts supporting an objectively reasonable basis to believe that Curtis required

emergency aid. The officers knew he had been shot. They saw that his arm and face wounds were improperly bandaged and had, at least at some point, been bleeding. They noted that he failed at times to respond to police, paramedics, and family members, and that he walked away from the ambulance towards his house. And they had heard that he might have been high on PCP, which can cause users to become psychotic, violent, and unpredictable. Dkt 19 at 4.

Curtis was undoubtedly injured. And it is correct that officers "do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Fisher*, 558 US at 49. But it is still just that—an exception concerning the need to render *emergency* aid. A respected legal dictionary defines *emergency* first by reference to "[a] sudden and serious event or an unforeseen change in circumstances that calls for immediate action to avert, control, or remedy harm," and second by description as "[a]n urgent need for relief or help." *Black's Law Dictionary*, Emergency (11th ed 2019). The exception itself thus pertains to a situation which by its nature requires immediate action and attention. *Stuart*, 547 US at 403 (suggesting immediate action such as protecting or preserving life). And the ultimate point of inquiry must not be forgotten—the *totality* of the circumstances, not simply those that support the action taken.

With that understanding, numerous facts undermine support for urgency or immediacy here. For instance, the encounter began when Curtis rode up to his own home on a bicycle. This was at a point in time nearly two hours since the reported shooting. And that shooting hadn't occurred in or near Curtis's home, but rather, at a location several miles away. Curtis had already bandaged his wounds, albeit improperly. The wound to his arm wasn't actively bleeding, and the wound to his cheek appeared to be a graze only. Curtis easily remained upright, able to express his intentions and walk about under his own power. He was in fact in the officers' presence upon arrival until entry into his home for nearly three minutes.

It is also apparent that no medical aid was rendered or requested outside the home. And so to the extent the professed concern was Curtis's need for medical attention, a countervailing

line of authority establishes a general liberty interest to refuse such treatment. See *Sama v Hannigan*, 669 F3d 585, 591 n 13 (5th Cir 2012) (collecting cases and considering in Eighth Amendment context); see also *United States v Husband*, 226 F3d 626, 632 (7th Cir 2000) (considering same in Fourth Amendment context). This requires a balancing of Curtis's liberty interests in this regard against relevant state interests. *Sama*, 669 F3d at 591.

For his part, Curtis rejected medical attention at several points outside his home, most notably when he twice walked away from the ambulance despite offers of help from HFD and EMT personnel. He had a right to refuse such medical attention. But it created no circumstance permitting an emergency intrusion *into* his home to render the aid that had been rejected and not rendered to him *outside* his home. As for interests of the state, this assertion concerning the need for emergency aid is unrelated to control of the situation at the home or the gathering of evidence of a crime. Compare *Husband*, 226 F3d at 631–33 (regarding forcible extraction of evidence from a suspect's mouth). The officers simply wanted to provide medical care. This is admirable, but it doesn't present a situation where Curtis was alone or dependent upon the officers and other government personnel as his only source of aid. His sister, his cousin, and a friend were present and expressed concern on his behalf. His cousin even offered to take him to the hospital. And that offer was made after Curtis replied, "Yeah," when Officer D'Avila directly asked him, "You want your people to come take you?" The presence of family and their willingness to assist Curtis, together with Curtis's own preference for them to take him to the hospital, lessened any need for the officers to render immediate aid. Curtis's general liberty interest to refuse medical treatment is thus paramount here.

The totality of circumstances answering this question must also include what occurred once everyone actually entered Curtis's home. If his injuries were objectively believed to be severe, one would think that aid would have been rendered *immediately* to him inside the house. It wasn't. To the contrary, even after the officers searched and then handcuffed Curtis, they neither had an EMT administer care to him in his living room,

nor had an ambulance gurney brought to take him out of his home. Indeed, one EMT seeking to render aid was waved off by the officers, followed by all HFD and EMT personnel being ordered out of the house by Officers Crum and D'Avila. The officers then eventually stood Curtis up and walked him outside under his own power to a police cruiser a fair distance away, even bypassing another cruiser closer to his home.

All told, nearly six minutes passed from the point in time when the firearm was found on Curtis's person until EMTs first attended to him at the police cruiser. That is double the three minutes Curtis was with the officers outside the home between arriving on his bicycle and going inside. Such after-the-fact delay itself belies assertion of an objectively reasonable basis to believe that Curtis was in need of emergency assistance requiring immediate entry into his home.

The government primarily relies upon the decision of the Supreme Court in *Michigan v Fisher*, 558 US 45 (2009). See Dkt 19 at 4. But the police officers there were responding to a report of an active domestic disturbance. They encountered a "tumultuous situation in the house" and "signs of a recent injury, perhaps from a car accident, outside." *Fisher*, 558 US at 48. The officers could also observe violent behavior inside the home. The Supreme Court held on those facts that it was objectively reasonable for the officers "to believe that Fisher had hurt himself (albeit nonfatally) and needed treatment that in his rage he was unable to provide, or that Fisher was about to hurt, or had already hurt, someone else." Id at 49.

By comparison here, no criminal activity was suspected to have occurred within or in the immediate proximity of Curtis's home. The officers arrived to find a relatively calm scene outside. They were aware of a shooting that had taken place two hours previously and some miles away. But nothing at Curtis's home indicated a need to prevent violence or restore order. As to Curtis's behavior, he remained calm throughout the entire encounter. The officers suspected that he might be high on PCP, which they testified can cause violent outbursts. Tr 41–42. But Curtis said nothing provocative and exhibited no aggressive tendencies at any point suggesting the potential danger or risks

associated with PCP use. And as noted above, much was already known about his injuries. He didn't appear to be in distress, and his family was willing to care for him. The totality of these circumstances indicated that his injuries weren't so severe as to require the "immediate aid" referenced in *Fisher*. 558 US at 47.

Curtis relies on *Linicomn* to argue that retreat into his home in response to offers of medical treatment cuts against any finding of exigent circumstances. Dkt 20 at 1. The Fifth Circuit there held that a father's retreat into his home in response to an officer's requests to enter without a warrant didn't give rise to exigent circumstances—even where the officers suspected he was attempting to get a gun and the mother reported their children to be ill inside. *Linicomn*, 902 F3d at 538. If retreat under those facts didn't give rise to exigent circumstances justifying warrantless entry, then certainly insufficient exigency existed here. Curtis simply manifested an intention to retreat into his home at several points during the encounter, while being prevented from doing so by the officers.

The Supreme Court observes that the Fourth Amendment "has drawn a firm line at the entrance to the house." *Payton v New York,* 445 US 573, 590 (1980). And the Fifth Circuit has "declined to apply the emergency aid exception absent strong evidence of an emergency at the scene or an imminent need for medical attention." *Linicomn*, 902 F3d at 536. The totality of these circumstances doesn't present the requisite strong evidence of the objective emergency necessary to the exception. As such, the government cannot rely on the emergency-aid exception to justify the warrantless entry and search within Curtis's home.

b.   Warrantless entry; consent

Voluntary consent is a specifically established exception to the Fourth Amendment's prohibition against warrantless searches. *Schneckloth v Bustamonte*, 412 US 218, 219 (1973). The Fifth Circuit holds, "The government does not need a warrant if it receives: (i) consent; (ii) that is voluntarily given; (iii) by someone with actual or apparent authority; and (iv) the search does not exceed the scope of the consent received." *United States v Staggers*, 961 F3d 745, 757 (5th Cir 2020), citing *United States v Freeman*, 482 F3d 829, 831–32 (5th Cir 2007).

The government bears the burden of proving by a preponderance of the evidence that it obtained consent. *United States v Santiago*, 410 F3d 193, 198–99 (5th Cir 2005) (quotation marks and citations omitted). Consent is determined based on the totality of the circumstances. *Gates v Texas Department of Protective & Regulatory Services*, 537 F3d 404, 420 (5th Cir 2008). Consent needn't be explicit. *Staggers*, 961 F3d at 757. It "can be implied from silence or failure to object if it follows a police officer's explicit or implicit request for consent." *United States v Martinez*, 410 F Appx 759, 763 (5th Cir 2011), citing *Jaras*, 86 F3d at 390. And it may be inferred from actions that reasonably communicate consent. *Staggers*, 961 F3d at 757–58, citing *United States v Lewis*, 476 F3d 369, 381 (5th Cir 2007). The government asserts that the officers' warrantless entry was justified by consent obtained from either Curtis or his sister. Dkt 19 at 5.

i.   Consent by Curtis

The government doesn't assert that Curtis explicitly consented to entry. It instead argues that he gave implied consent. Dkt 19 at 5. Curtis disagrees, arguing that his behavior communicated only his desire to decline medical treatment, to refuse to talk to the police, and simply to retreat into his own home. Dkt 20 at 2.

One thing that didn't happen is obvious—no officer or other personnel on the scene ever asked Curtis for permission to enter his home. It is also beyond dispute that there was ample time and opportunity to ask that simple question. Approximately three minutes passed from the time Curtis arrived back to his home on his bicycle and when he walked through his front door. After Curtis dismounted from his bicycle, the officers paused Curtis to speak with him in front of the fire truck and then once again closer to his front door. That failure of specific request weighs against a finding of voluntary consent here. See *United States v Castapheny*, 2007 WL 1308976, *2 (SD W Va) (consent not found where officers failed to request permission to enter home despite ample opportunity to do so).

Consider, for instance, a question the officers did ask Curtis twice during this time. Grundy had spoken with Curtis just before Curtis walked off towards his home for the first time. Grundy

relayed to the officers that Curtis said he wanted to go into his house to get something. What was it that Curtis wanted to get? Officer D'Avila first asked him that question when Curtis walked away from the fire truck and ambulance. Officer Crum asked that question again when Officer D'Avila stopped Curtis again about ten feet away from the front door. But an officer asking what a person needs inside of his or her home is a very different question than that officer asking to come inside to help obtain it. No one asked or even alluded to permission in that regard. And even as to the question asked, Curtis never answered. He simply remained silent.

The government points to certain affirmative declarations by Curtis. When Officer D'Avila restrained Curtis in front of the fire truck, he told Curtis he wasn't in trouble. Curtis said, "Alright." Officer D'Avila then asked, "You want your people to come take you?" Curtis said, "Yeah." When Officer D'Avila again stopped Curtis closer to his home, he told Curtis he was delirious, needed to sit down, and let HFD come check him out. Curtis responded with a frustrated tone, "OK." Officer Crum then asked Curtis if he recognized him. Curtis responded, "Yeah." Officer Crum reiterated that Curtis wasn't in trouble. Curtis again said, "OK." These are at best equivocal statements regarding the need for medical treatment outside the home. None provide or imply consent for the officers to enter Curtis's home.

This argument also essentially seeks to convert a suggested need for emergency aid into the basis for a much broader provision of consent. This would combine distinct exceptions to the warrant requirement into one. But these exceptions are carefully drawn and delineated. *United States v Jenkins,* 46 F3d 447, 451 (5th Cir 1995). Where the emergency-aid exception applies, it alone supports warrantless entry and entirely displaces the need for consent. But where the basis is to be consent, it must be consent on the ultimate issue—agreement that the officer can enter a person's home without a warrant. For example, the Fifth Circuit in *Gates* focused its analysis of consent on whether the pertinent statements "might have indicated to a reasonable officer that he or she had *permission to enter the house.*" 537 F3d at 420–21 (emphasis added). This also pairs with required analysis

under the consent exception to ensure that "the search does not exceed the scope of the consent received." *Staggers*, 961 F3d at 757 (citation omitted). And it must be remembered that the final inquiry at the threshold had nothing even to do with entering to render aid, but instead concerned whatever it was Curtis had told his cousin he wanted to go inside to get. Compare *United States v Harvey*, 901 F Supp 2d 681, 693 (ND W Va 2012) (declining to construe statement to officer of need to obtain identification in home as "offer" asking officer to accompany him to retrieve it).

The government doesn't here suggest that Curtis gave any consent to enter his home to make any search at all. Allowing the emergency-aid exception to instead loosen the consent exception would undervalue core Fourth Amendment protections afforded to the home and untether each distinct exception from its underlying justification. See *Collins v Virginia*, 138 S Ct 1663, 1671 (2018). These exceptions must instead remain distinct if they are to retain their constitutional character. *Katz,* 389 US at 357.

So, no one asked or alluded to the simple question of whether they could enter Curtis's home. Without that, the inquiry turns to gestures or conduct that can reasonably be construed as consent. See *Staggers*, 961 F3d at 757–58. The government asserts that Curtis impliedly consented "when he silently allowed [Officer Crum] to open his door and lead him into his house." Dkt 19 at 5. But that is not what the bodycam footage shows. The door was instead already open when Officer Crum entered ahead of Curtis. The videos don't indicate that Curtis gestured for Officer Crum to help him through his own front door or that he needed any help doing so. Nor does it show that Officer Crum assisted or guided him in any way. Officer Crum simply entered first, opening the door a bit more for himself to do so.

The footage preceding that entry also shows the officers blocking Curtis from actually going inside his home. Officers D'Avila and Crum each positioned themselves between Curtis and his front door as he attempted to walk towards his house. They also put their hands on him to prevent him from going inside while seeking to engage him in conversation. Despite this, Curtis continued on, finally walking through his front door.

Officer Crum had preceded him over the threshold. But Curtis walked past him even then, attempting to exit the living room at the other end. Officer Crum again halted him by touching his right arm and telling him to sit down.

These actions don't give rise to a reasonable inference of consent. Compare *Staggers*, 961 F3d at 757–58, citing *Lewis*, 476 F3d at 381 (finding consent where actions by defendant included opening door wider and stepping aside for officer to enter). Implied consent here would have to be premised exclusively on Curtis's silence and lack of resistance to the officer's entry. But silence or passivity cannot alone form the basis for consent to enter. *Roe v Texas Department of Protective and Regulatory Services,* 299 F3d 395, 402 (5th Cir 2002). Consent can be implied from silence or failure to object only when "it follows a police officer's explicit or implicit request for consent." *Martinez*, 410 F Appx at 763; see also *Jaras*, 86 F3d at 390.

None of the questions or actions by the officers or other personnel can be construed as explicit or implicit requests for consent to enter Curtis's home. Instead, those questions and actions appear to consciously avoid making such a request. Admonition by the Fifth Circuit in *Jaras* is thus equally applicable here:

> It is one thing to infer consent from actions responding to a police request. It is quite another to sanction the police walking in to a person's home without stopping at the door to ask permission. . . . To infer consent in this case is only a conjecture and would exceed the scope of any recognized exception to the Fourth Amendment's bar to warrantless entry of a home.

86 F3d at 390, quoting *United States v Shaibu*, 920 F2d 1423, 1427 (9th Cir 1990).

"We must not shift the burden from the government—to show 'unequivocal and specific' consent—to the defendant, who would have to prove unequivocal and specific objection to a police entry, or be found to have given implied consent." *Shaibu*, 920 F2d at 1427–28. Curtis's lack of objection and resistance in

response to the officers accompanying him into his home evinces, at most, "no more than acquiescence to a claim of lawful authority." *Bumper v North Carolina*, 391 US 543, 549 (1968). This is insufficient to discharge the government's burden. Ibid; see also *Santiago*, 410 F3d at 199.

ii.    Consent by Curtis's sister

The government also contends that Curtis's sister gave implied consent and had apparent authority to do so. Curtis doesn't dispute that his sister had at least apparent authority to give consent to entry into the home, where she and her children appeared to live. But he does dispute whether she actually consented.

As with Curtis, no officer asked his sister for permission to enter the home. The government contends that she consented by stating outside the home that she had Curtis's phone, by not objecting to the police's entry, and by assisting them inside the house when saying that Curtis was "'bout to fall out" after he sat down on his sofa. Dkt 19 at 5. None are sufficient. Her statement inside the home was just that—after she and the officers had already entered. It cannot serve as the basis for consent at the necessary, prior time. That she didn't object to the officers' entry doesn't support implied consent in these circumstances, for reasons already stated above. Her statement that she had Curtis's phone was at least said outside and before Officer Crum entered the house. But it is quite attenuated from a showing of implied consent. If anything, she was suggesting that there was no need even to enter the home at that time. And she was communicating to Curtis, not the officers.

The government also argued at hearing that Curtis's sister impliedly consented to the officers' entry into the home by encouraging their efforts to provide medical aid. Tr 134. This referred to her affirmatively nodding her head in support of getting Curtis medical attention when the officers first spoke with her and Grundy in front of the home. This was before Curtis had even arrived. And of course, when he arrived on his bicycle, he was outside the home on the street. Such gestures are too far removed in time and place from the officer's actual entry into the home. They can't reasonably be understood to indicate consent

to enter the home. And again, it conflates the idea of consent to entry without a warrant with the emergency-aid exception.

Neither Curtis nor his sister provided consent to the officers' entry into the home. The government thus can't rely on this exception to justify the warrantless entry and search within Curtis's home. See *Jaras*, 86 F3d at 390.

### c.   Pat-down search

The government also seeks to justify the seizure of the gun and ammunition from Curtis's person as a pat-down search under *Terry v Ohio*, 392 US 1 (1968). Dkt 19 at 6–7. This is a "very narrow exception," allowing police officers to briefly detain a person for investigative and safety purposes if they can point to "specific and articulable facts" that give rise to reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime. *United States v Monsivais*, 848 F3d 353, 357 (5th Cir 2017), quoting *United States v Hill*, 752 F3d 1029, 1033 (5th Cir 2014). The Supreme Court holds, "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 US at 27.

Those specific and articulable facts existed here, the government says, because Curtis reached into his left pocket once he was inside his own home and seated on his couch. Officer Crum testified that at that same time he noticed a large lump or bulge in Curtis's right pocket. Tr 36. His search of that pocket then procured the disputed evidence.

But Officer Wakefield testified that she saw Curtis grabbing at his right pocket as he got off his bicycle when still out on the street. Tr 94, 98. And the video plainly showed Curtis holding his right pocket when walking from the street into his front yard. A very different question would be presented had the officers actually conducted the same pat-down search at that place and time—outside the home upon or shortly after Curtis's arrival. Consider that scenario. The officers had also heard that there was a retaliatory shooting involving someone fitting Curtis's description. A call had come in that Curtis had been shot. He was known to them as a felon and documented gang member. They

heard that he may also have been high on PCP. Could all those facts taken together give rise to a reasonable belief that the safety of the situation was at risk, thus justifying a brief pat-down? Perhaps.

The simple fact is, however, that no search was done *before* Curtis peacefully and without provocation crossed the threshold into his home. The circumstances under review thus also include the warrantless entry by the officers into that home prior to the observations by Officer Crum once inside. That is the actual question presented—the extent to which this type of search may occur inside a person's home where independent circumstances don't support the presence of police there in the first place.

The Supreme Court hasn't addressed the constitutionality of a *Terry*-style search and seizure within a person's home. See *United States v Richmond*, 924 F3d 404, 412 (7th Cir 2019), cert denied, 140 S Ct 1136 (2020). And the Fifth Circuit hasn't been squarely presented this issue. For example, see *United States v Darensbourg*, 236 F Appx 991, 993–94 (5th Cir 2007) (unpublished) (addressing *Terry* pat-down of defendant inside home where homeowner consented to officers' entry and defendant didn't contest location of search).

The decision by the Fifth Circuit in *United States v Scroggins* appears to be the closest guiding precedent. 599 F3d 433 (5th Cir 2010). At issue there was the constitutionality of a warrantless entry by police officers into a defendant's home and their ensuing protective sweep and *Terry*-style frisk of the defendant. Id at 444. The Fifth Circuit found consent to justify the initial entry. Id at 442. It also held that further events within the home justified their seizure of the defendant. Id at 445. But it declined to uphold that seizure under *Terry*. The Fifth Circuit expressed doubt about the extension of *Terry* within the home, observing "Under *Terry*, officers may briefly detain an individual *on the street* for questioning, without probable cause, when they possess reasonable, articulable suspicion of criminal activity." Id at 441 (emphasis added); see also *United States v Michelletti*, 13 F3d 838, 840 (5th Cir 1994) (*Terry* doctrine was developed to determine when police could "detain individuals on the street" and subject them to search). The Fifth Circuit thus limited justification of the

22

seizure in *Scroggins* to the protective-sweep doctrine articulated in *United States v Gould*, 364 F3d 578 (5th Cir 2004). *Scroggins*, 599 F3d at 444–45. While that decision doesn't preclude the availability of the *Terry* doctrine in the home, it certainly makes the constitutional validity of the officers' presence within the home a key focus.

Precedent available from other circuits also appears to allow for a *Terry* pat-down inside the home if the officers were justified when originally entering the home. For instance, after finding "no support for the proposition that the in-home setting automatically eclipses any and all interests in officer safety," the First Circuit held that *Terry* applies within a home if the officer is legitimately on the residential premises pursuant to consent or other lawful authority. *United States v Romain*, 393 F3d 63, 75 (1st Cir 2004). The Second, Third, Seventh, and Eighth Circuits are in accord. See *United States v Gori*, 230 F3d 44, 56 (2d Cir 2000) (holding *Terry*-style frisk in hallway outside apartment allowed if presence supported by consent); *United States v Murray*, 821 F3d 386, 393 (3d Cir 2016) (holding *Terry* applied to a limited pat-down search inside hotel room where officers were already lawfully present); *Richmond*, 924 F3d at 412 (upholding *Terry* pat-down occurring within curtilage of defendant's home after defendant permitted officers to enter onto porch area); *United States v Brooks*, 2 F3d 838, 842 (8th Cir 1993) (upholding *Terry* pat-down within defendant's home after defendant consented to officer's entry into home).

The Sixth and Eleventh Circuits have also focused on whether the officers were lawfully present in the home before the *Terry*-style frisk. See *United States v Saari*, 272 F3d 804, 809 (6th Cir 2001) (holding that equivalent of *Terry* stop may not occur inside home unless warrantless entry was supported by exigent circumstances); *Moore v Pederson*, 806 F3d 1036, 1039 (11th Cir 2015) (same). The Tenth Circuit has approached the issue in a comparable way. It held in *Harmon v Pollack* that *Terry* couldn't alone justify an in-home search and detention of a plaintiff. 586 F3d 1254, 1262 n 2 (10th Cir 2009). But the officers there were proceeding under a valid warrant. The Tenth Circuit thus found their actions justified under *Michigan v Summers*, 542 US 692

23

(1981), which holds that officers executing a search warrant for contraband have authority to detain the occupants of the subject premises while conducting a proper search. *Pollack*, 586 F3d at 1262.

The Ninth Circuit appears to be in line with this precedent. See *United States v Flippin*, 924 F2d 163, 166 (9th Cir 1991): "When the police have lawfully entered a dwelling and have a reasonable suspicion that a suspect is armed, a *Terry* pat down for weapons is permissible." But later cases have called this into doubt by flatly asserting that *Terry* doesn't apply at all to in-home searches and seizures. See *United States v Struckman*, 603 F3d 731, 738 (9th Cir 2010), citing *United States v Martinez*, 406 F3d 1160, 1165 (9th Cir 2005). But even in *Struckman*, the court went on to address whether probable cause or exigent circumstances could have supported the officer's actions in arresting the defendant in his backyard. This suggests that the Ninth Circuit still approves as constitutional something like a *Terry*-style pat-down within the home if supported by an independent exception to the warrant requirement.

There is one thing that *Terry* clearly is not under all these cases—a provision of authority to enter a home without a warrant. That provision of authority is instead a separate and critical inquiry. And the Court resolves the issue on that basis. If officers have entered a home in a manner consistent with the limitations of the Fourth Amendment, then it is conceivable that circumstances can permit a *Terry*-type frisk. For instance, had the officers here entered Curtis's home with his consent and specific and articulable facts thereafter called into question the safety of the situation once inside—if he then turned aggressive or threatening, or if another person raising similar concerns appeared—a limited search could well be found reasonable. But where officers are in error under the Fourth Amendment—if they find themselves in a home that the Constitution doesn't permit them then to be—prosecution based on evidence seized during a *Terry*-type frisk stretches the doctrine too far.

Were the officers permitted to be inside Curtis's home without a warrant? No, as set forth at length above. That they might be able to articulate sufficient and reasonable concerns

under *Terry* that could support a search *on the street* doesn't support the same search *inside the home*—at least not insofar as the fruits of that search are to be the basis of subsequent prosecution. Any other conclusion brings the exceptional procedure authorized in *Terry v Ohio* perilously close to support of the rejected concept of the *general warrant*. The Supreme Court has explained that the general warrant typically specified only an offense and then left it to officials executing the warrant to determine which persons and places to search. *Steagald v United States*, 451 US 204, 220 (1981). The use of such warrants was most certainly something that those who ratified the Bill of Rights understood as forbidden by the text of the Fourth Amendment. See *Hayden*, 387 US at 301 n 9, citing *Boyd*, 116 US at 630. The extension of *Terry* that the government seeks here would in large measure undo this protection. For officers could then enter a suspect's home without a valid warrant or an applicable exception—and yet still prosecute the suspect with evidence seized from his or her person, simply upon articulation of *Terry*-style safety concerns or indicia of criminal activity once wrongfully inside.

To be clear, the Court doesn't doubt for a moment that officers must and are entitled to take reasonable precautions to ensure their safety at every moment of their workday. But here, the officers entered Curtis's home with neither consent nor any other supporting exigent circumstance. That they took precautions to ensure their safety after impermissibly entering the home doesn't answer the question whether the fruits of that search permissibly support Curtis's prosecution.

The Court holds that, once across the threshold into Curtis's home, the proper inquiry is justification for warrantless entry by the officers in the first instance—not whether a pat-down search was thought independently necessary once inside. The evidence must be excluded.

### 4. Conclusion

The search of Defendant Eric Wayne Curtis and seizure of the subject firearm and ammunition occurred within the walls of his home. No warrant or probable cause permitted police officers to be in his home that evening. And the government fails to meet

its burden to prove that an exception to the warrant requirement applies.

The motion to suppress the firearm and ammunition is GRANTED. Dkt 18.

The evidence of the firearm and ammunition is SUPPRESSED as the product of an unconstitutional search. This evidence cannot be used against Curtis at trial.

SO ORDERED.

Signed on September 29, 2020, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge